**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| Steven D. Lisle, Jr. (R40159), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 22 C 50338 |
| v. | ) | |
| | ) | Hon. Iain D. Johnston |
| Ditzler, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Steven D. Lisle, Jr., an unrepresented Illinois prisoner, brought this action under 42 U.S.C. § 1983 concerning an incident on October 28, 2021, when Defendants, who are correctional and medical personnel at Dixon Correctional Center, denied her the use of a wheelchair. All Defendants have moved for summary judgment, dkts. 147, 152, and Plaintiff has responded, dkts. 159, 163. For the reasons below, the Court grants Defendants' motions in full.

**<u>Background</u>**

The following facts are taken from the parties' Local Rule 56.1 submissions.[1] Any disputes are explicitly noted.

[1] Defendants have complied with Local Rule 56.1. They each filed a LR 56.1 statement of materials facts, Dkt. 153, "Mershon-SMF", and Dkt. 148, "Officers-SMF", and they each filed a memorandum of law, see Dkt. 155, "Mershon-MEM" and Dkt. 149, "Officers-MEM". Plaintiff filed an omnibus response, Dkt. 159, "PRESP", with three sections: a response to Mershon's LR 56.1 statement, PRESP, pg. 3-9; a response to the Officer Defendants' LR 56.1 statement, PRESP, pg. 9-11; and her own statement of additional fact, PRESP, pg. 11-15. Later, she separately filed the exhibits cited throughout her response. Dkt, 163, pg. 3-89 and 131-191 "PEXS". Within that same filing, Plaintiff also submitted a memorandum of law. Dkt. 163, pg. 90-110, "PMEM". All Defendants, consistent with LR 56.1, filed responses to Plaintiff's additional facts. Dkt. 166, "Mershon-RESP", and Dkt. 169, "Officers-RESP". Plaintiff is an extremely prolific litigator throughout this circuit – since 2013, she has filed over y 40 cases in this and the Central and Southern Districts of Illinois, as well as numerous appeals in the Seventh Circuit. Summary judgment was briefed in many of her prior cases, and her submissions here are very thorough and in substantial part comply with LR 56.1. But where they consist of legal argument or unsupported conclusions, the Court will disregard those responses. *See Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1018 (N.D. Ill. 2018) (court may disregard any part of factual statement or response that consists of legal arguments or conclusions). And where Plaintiff has not properly responded to a certain fact or has admitted it, the Court will accept it as true to the extent supported by the record. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Nonetheless, although the Court is entitled to demand strict compliance with Local Rule 56.1, *see Coleman v. Goodwill Indus. of Se. Wis., Inc.*, 423 F. App'x. 642, 643 (7th Cir. 2011), it will generously construe the facts identified by Plaintiff to the extent they are supported by the record, or she could properly testify to them. *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (courts may construe *pro se* submissions leniently). The Court will not look beyond the cited material, however. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003) ("[D]istrict courts . . . are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them.").

*Parties*

Plaintiff Steven D. Lisle, Jr. ("Lisle")[2] was an inmate at Dixon Correctional Center ("Dixon") at the relevant time. Mershon-SMF ¶ 1. Defendant Kristina Mershon ("Mershon") is a licensed nurse practitioner who has practiced in that capacity since 2015. She has education, training, and experience treating patients in correctional settings, including patients with symptoms similar to those Lisle reported in October 2021. Mershon-SMF ¶¶ 3-4. During the events relevant to this case, Defendants Daniel Ditzler and Joshua Fiorini were correctional officers at Dixon (collectively "Officer Defendants"). Officers-SMF ¶¶ 2-3. Ditzler and Fiorini did not have medical training or education. Officers-SMF ¶ 25.

*October 20, 2021 Self-Harm Incident and Injury*

On October 20, 2021, Lisle, in what she self-reported as a "suicide attempt", ingested foreign objects and jumped or fell from a second-story balcony or tier. Mershon-SMF ¶ 10; PRESP ¶¶ 1-2. Lisle was immobilized by emergency medical staff ("EMS") and transported via ambulance from Dixon to Katherine Shaw Bethea Hospital ("KSB Hospital") after Lisle reported to the EMS that she could not feel her legs and complained of head and neck pain. Mershon-SMF ¶ 10; PRESP, pg. 12 at ¶¶ 3-4; Mershon-RESP ¶¶ 3-4.

At KSB, Lisle reiterated the same complaints she had made to the EMS, and also denied back, joint, muscle, or spinal pain. Mershon-SMF ¶ 10. Lisle underwent a neurological examination. Mershon-SMF ¶ 11. Although Lisle reported an inability to move or feel her extremities, she was able to feel pinprick testing on her thighs, was observed curling her toes, and on retesting reported sensation in areas she had previously identified as insensate. Mershon-SMF ¶ 11.

KSB also ordered CT imaging of Lisle's head and cervical spine, as well as abdominal and chest X-rays based on the reported fall and ingestion of foreign objects. Mershon-SMF ¶ 12. The head CT showed no intracranial bleeding, and the cervical-spine CT showed no abnormalities. Mershon-SMF ¶ 12. No diagnostic testing of Lisle's lower extremities was performed. Mershon-SMF ¶ 13. A rectal examination showed excellent sphincter tone, and Lisle had excellent deep-tendon reflexes in the lower extremities. Mershon-SMF ¶ 14.

KSB Dr. Gallant documented that Plaintiff continued to report an inability to move her legs, but that her neurological examination was inconsistent and changed several times. Mershon-SMF ¶ 14. He discharged Lisle to follow-up with the medical unit at Dixon with respect to both the fall and ingestion of foreign objects. Mershon-SMF ¶ 14. Lisle was also assessed to be malingering. Officers-SMF ¶ 7.

Lisle's mode of discharge from KSB was identified as "wheelchair", and she was transported from KSB to Dixon in a KSB wheelchair. PRESP, pg. 3 at ¶ 8(b), pg. 12 at ¶ 6; Mershon-RESP ¶ 6. But the KSB records contain no diagnosis of a lower-extremity injury, no

[2] Lisle's filings indicate that she is a transgender woman who refers to herself using female pronouns.

order requiring wheelchair use, and no additional treatment or follow-up concerning Lisle's spine or legs; Lisle was also assessed not to be a fall risk. Mershon-SMF ¶ 15.

*Post-Injury Events Preceding the October 28, 2021 Incident*
*(October 21, 2021 through October 27, 2021)*

Lisle returned to Dixon and was admitted to the infirmary from October 21 through October 22. Mershon-SMF ¶ 7. The first infirmary progress note, dated early in the morning of October 21, records that Lisle arrived in a wheelchair from KSB and claimed she could not walk, but also states that Lisle was able to kneel, move herself onto the bed, and that she had denied numbness or tingling in her extremities. Mershon-SMF ¶ 8; PRESP, pg. 12, at ¶ 7; Mershon-RESP ¶ 7. According to the Crisis Log maintained by Dixon staff after Lisle returned from KSB, on October 22, Lisle was observed standing in her cell and putting "toilet paper into the vents to block the air." Mershon-SMF ¶ 19. Also that day, October 22, the Infirmary Progress Note states that Lisle reported that she could not move her legs, but she was also observed standing. Mershon-SMF ¶ 20. She was discharged in fair condition with diagnoses including status post fall, foreign-body ingestion, and malingering. Mershon-SMF ¶ 20. The same note documents that Lisle was issued a low-bunk permit for safety to be used post-discharge from the infirmary. Mershon-SMF ¶ 21. The Nurse's note from Lisle's discharge states that Lisle presented "angry that he only has a permit for 'wc' for transport." Mershon-RESP ¶ 14. The infirmary "flowsheet" indicates that, on both days, Lisle could transfer and walk independently. Mershon-SMF ¶ 7.

According to Lisle, a Dixon physician in the infirmary, on either October 21 or 22, verbally told her that he would provide her with a wheelchair permit so she could continue using the wheelchair for transportation and "to be mobile" throughout the facility. PRESP, pg. 13 at ¶ 12. Defendants dispute this: they note that Lisle's medical records from those dates with the Dixon doctor in the infirmary, detailed above, contain no notations that Lisle had been informed that a wheelchair permit would be ordered, nor notations that instructed Lisle to use a wheelchair. Mershon-RESP ¶ 12.

Lisle admits that despite the alleged conversation with the Dixon doctor, she was not in fact provided a wheelchair permit between October 21-28, 2021. PRESP, pg. 9 at ¶9(a). Lisle testified that she nonetheless continued to possess and utilize the wheelchair to get around the prison, go to the healthcare unit, and get into her cell up until the October 28 incident. Dkt, 154-1, pg. 7-9; PMEM, pg. 91-92. In response, Defendants note that the only indications in the records that Lisle possessed a wheelchair after her return from KSB are the nurses note from October 21 indicating that Lisle had arrived to the infirmary "per WC from KSB ER", a nursing Infirmary Admission Sheet, indicating that Lisle's "Mode of Admission was that of a "wheelchair from hospital", and the first three entries of the Crisis Watch Notes that were initiated on October 2 from 2:50 am – 3:39 am. Mershon-SMF ¶ 30. The Crisis Watch Notes do not mention a wheelchair thereafter, nor do the remainder of her mental-health records from the relevant period. Mershon-SMF ¶¶ 31-32. It is, though, undisputed that Lisle possessed the wheelchair on October 28, when the underlying incident occurred. *See below.*

On October 23, Lisle was transferred to CGH Medical Center after reporting epigastric pain. Mershon-SMF ¶ 24. Lisle was transported to CGH in a wheelchair pursuant to the hospital's

transportation protocol. Mershon-SMF ¶ 24. At CGH, Lisle reported, among other things, that she "jumped off a 2 story staircase later that same day and has been having back pain and right thigh pain. She reported if she tries to walk she feels something pulling in her right thigh." Mershon-RESP ¶ 11. But her musculoskeletal examination was normal. Mershon-SMF ¶ 24. At CGH, Lisle received CT exams of her spine, which showed no significant abnormalities, and she was discharged with no further orders relating to her spine or lower extremities. Mershon-SMF ¶ 25-26, 38. Upon discharge, the records did not identify an impaired-mobility condition, designate Lisle as a fall risk, diagnose a lower-extremity injury, or order wheelchair use. Mershon-SMF ¶ 26. Lisle's "mode of discharge" from CGH was "wheelchair". Mershon-RESP ¶ 11.

Following Lisle's discharge from CGH on October 23 and up until October 28, the medical records document no complaints with respect to specifically her lower extremities or alleged inability to walk. Mershon-SMF ¶ 28. On October 27, a nurse's note reflects that Lisle complained that day of pain in "arms, back, all over", which she had been experiencing for "a couple of weeks". Mershon-RESP ¶ 15. She also complained that her pain had worsened since her October 20 fall. Mershon-RESP ¶ 15. The nurse noted that day that Lisle's "gait" was "steady". Mershon-RESP ¶ 15.

*The October 28, 2021 Incident*

On October 28, Lisle was housed in cell 29 in the A-Wing of X-House. Officers-SMF ¶ 13. That day Ditzler was assigned to the position of an ERT Escort; the Daily Shift Roster shows that he had been reassigned to that position from the position of working in the Visiting Room. Officer-RESP ¶ 24. Ditzler testified that, on October 28, either "medical staff or my supervisor (I do not recall exactly who it was)" asked him to remove a wheelchair from A-Wing because Lisle did not have a wheelchair permit. Officers-SMF ¶ 14; PRESP, pg. 9-10 at ¶ 9(b). Ditzler accordingly removed a wheelchair from A-Wing of X-House on the morning of October 28. Officers-SMF ¶ 14. According to Ditzler and Fiorini, individuals in custody were required to have a wheelchair permit to possess a wheelchair in the housing unit. Officers-SMF ¶ 15. They testified that a wheelchair without a permit was considered contraband and subject to removal. Officers-SMF ¶ 15; PRESP, pg. 10 at ¶ 9(c).

Lisle testified that when Ditzler took the wheelchair, she verbally advised Ditzler that a Dixon doctor had given her the wheelchair to get around because her legs were still not mobile. PRESP, pg. 13 at ¶ 16. Lisle then also testified to the following: later that day on October 28 Fiorini, who was assigned as an Escort Officer, came to escort her to an appointment with Mershon; Lisle told Fiorini that she could not walk properly due to jumping off the tier and that a Dixon doctor had authorized her to get around the unit with a wheelchair; she told Fiorini that the wheelchair was outside the unit because Ditzler had taken it; and in response, Fiorini told her that Mershon had told him that Lisle did not need a wheelchair, and he told Lisle that if she did not walk then she could not go to her appointment with Mershon. PRESP, pg. 13 at ¶ 17; Officers-RESP, ¶¶ 17, 24. Lisle testified that she had to hold onto the wall and limp on hurt legs to get to her October 28 appointment with Mershon. PRESP, pg. 14 at ¶ 19.

Fiorini testified that he does not recall escorting Lisle to see Mershon on October 28, does not recall her asking him for a wheelchair, and does not recall speaking to Mershon that day.

Officers-RESP, ¶ 17. Mershon testified that she did not instruct security personnel to remove a wheelchair from Lisle's possession. Mershon-SMF ¶ 45.

At the October 28 appointment, Lisle was examined by Mershon in follow-up from her October 23 visit to CGH. Mershon-SMF ¶ 36. Mershon had not personally evaluated Lisle between the October 20 incident and the October 28 examination and testified that she had not observed Lisle using a wheelchair during that period. Mershon-SMF ¶ 33-34. Mershon testified, and Lisle does not dispute, that she saw Lisle ambulate without aid at the appointment. Mershon-SMF ¶ 36. Mershon's contemporaneous note from the October 28 examination states that Lisle was angry and repeatedly demanded a wheelchair and would not engage in a discussion concerning the risks and benefits of wheelchair use for soft-tissue injuries. Mershon-SMF ¶ 36. The note states that at the examination Mershon informed Lisle of the results of her CT studies at CGH, which showed no significant abnormalities, but Lisle refused to acknowledge those results or discuss treatment options; rather, Lisle continued to demand a wheelchair. Mershon-SMF ¶¶ 36-38. According to Mershon's note, Lisle left the examination room while ambulating, but stating that she needed to hold onto objects because her right back and right leg hurt. Mershon-SMF ¶ 36. Mershon documented that Lisle subsequently fell, unwitnessed, on the floor of another wing. Mershon-SMF ¶ 36.

Lisle's gallery officer heard a "loud commotion" and called a "Code 3". Mershon-RESP ¶ 23. Mershon, Nurse Engel, and security personnel responded. Mershon-RESP ¶ 23. Mershon physically examined Lisle after the fall, medically cleared her, and entered follow-up orders. Mershon-SMF ¶ 39. According to her medical note, when Mershon approached, Lisle stated that she had fallen because she needed a wheelchair. Mershon-SMF ¶ 36. Mershon documented that Lisle then held her left leg and, when asked about the change from her earlier complaint of right-leg pain, responded that she now had pain in the left leg. Mershon-SMF ¶ 36. Mershon documented right low-to-mid-back tenderness and that Lisle reported "pain to palpitation", but found Lisle neurologically intact and observed no visible bruising, deformity, inflammation, or other apparent injury. Mershon-SMF ¶ 36. Mershon determined that Lisle had not sustained any serious or additional injuries, that Lisle was able to ambulate under her own power, and that she required no emergent medical attention. Mershon-SMF ¶ 41. Mershon documented that Lisle declined assistance to stand and instead crawled several feet to her bed. Mershon-SMF ¶ 36. Mershon ordered follow-up as needed, and she entered treatment orders for a KUB (which had already been ordered), prednisone, and tramadol, and scheduled a follow-up appointment for November 1. Mershon-SMF ¶ 36. The medical records then reflect that Lisle subsequently received a seven-day prescription for Ultram[3], consistent with Mershon's order, beginning the next day, October 29. Mershon-SMF ¶ 40.

Nurse Kimberly Engel was present during Mershon's initial examination. Mershon-SMF ¶ 52. Engel testified that Lisle was independently ambulatory when she presented to Mershon and that Mershon's note accurately described the interaction. Mershon-SMF ¶ 53. Engel also accompanied Mershon and witnessed Mershon examine Lisle after the reported fall and observed that Mershon prescribed medication to address Lisle's reported symptoms. Mershon-SMF ¶ 56. Then, the next day, on October 29, Engel documented that Lisle continued to report leg, back, and

[3] Ultram is a brand name for tramadol – a narcotic pain killer. https://www.mayoclinic.org/drugs-supplements/tramadol-oral-route/description/drg-20068050

shoulder pain, which Lisle rated as 9 out of 10. Mershon-SMF ¶ 57. Engel observed no bruising, swelling, or deformity and documented that Lisle had been informed of the new medication orders and instructed to allow the medication time to work. Mershon-SMF ¶ 56.

Lisle testified that during the October 28 examination, she told Mershon that due to her body weight (over 250 pounds) and her fall, that her legs, back, and body hurt, and that she could not walk properly. PRESP, pg. 14 at ¶ 19. Lisle says that she told Mershon that a Dixon doctor allowed her to use the wheelchair, and she asked Mershon to issue a permit; Lisle says Mershon refused and also refused to provide her any medical device for her legs. PRESP, pg. 14 at ¶ 20. Lisle testified that she had to limp back to A wing, holding onto the wall and with hurt legs. PRESP, pg. 14 at ¶ 21. Lisle testified that her legs gave out when she arrived at A wing due to pressure, pain, and weight. PRESP, pg. 14 at ¶ 22. This, she says, caused her to slip and fall to the hard cement and reinjure herself. PRESP, pg. 14 at ¶ 22. Contrary to Mershon's note, which documented "pain to palpitation", Lisle testified that Mershon "did not physically touch or look at [her]" back, legs, or body during the post-fall examination. PRESP, pg. 15 at ¶ 28; Mershon-RESP, ¶ 28. Lisle also produced an incident report generated after the fall that states that she wanted the security staff who were present to drag her into her cell, but they declined because she had been medically cleared to return under her own power. PRESP, pg. 15 at ¶ 29. The incident report states that Lisle said, she "would have all of the staffs' jobs for not dragging [her] . . . Lisle then waved at the camera and crawled into [her] cell." PRESP, pg. 15 at ¶ 29. Lisle also testified that she refused to get up and crawled into her cell instead. PRESP, pg. 14 at ¶ 26.

Mershon's medical records reflect that Lisle refused follow-up visits on November 2 and 3. Mershon-SMF ¶ 42. Lisle, however, testified that she was housed on suicide crisis watch at the time, and no Dixon employees asked her if she wanted to go to an appointment with Mershon. PRESP, pg. 7 at ¶ 8(k). However, Lisle had multiple visits with Mershon and other medical professionals in follow-up throughout November 2021, including an x-ray of her right ankle. Mershon-RESP, ¶ 21. The medical records do not contain a diagnosis of a lower-extremity injury attributable to the October 28 fall. Mershon-SMF ¶¶ 51, 62-63.

*Subsequent Testimony and Admissions*

Lisle admits that prior to October 28 she had been examined by three separate medical doctors – on October 20 at KSB, October 21, 25, and 27 at Dixon, and October 23 at CGH – none of whom diagnosed Lisle with a lower extremity injury or indicated that Lisle required a medical assistive device. Mershon-SMF ¶ 44; PRESP, pg. 7 at ¶8(l). Lisle admits that there are no medical records from the period of October 21-28 that indicate that a wheelchair permit was ordered, that she received a wheelchair permit, or that a wheelchair was determined to be medically necessary. Mershon-SMF ¶ 27; PRESP, pg. 5 at ¶8(d).

Mershon testified that her medical decision-making on October 28, both during her initial assessment and subsequent assessment after Lisle's fall that day, was based upon her education, training, and experience, and was premised upon Lisle's clinical presentation and what was appropriate in light thereof. Mershon-SMF ¶ 41. Based on her education, training, experience, Lisle's clinical presentation, and Lisle's pertinent medical history, Mershon testified that she did not believe a wheelchair was medically indicated on October 28. Mershon-SMF ¶ 47. Mershon

testified that she exercised medical judgment when treating Lisle on October 28, and her decisions were within the applicable standard of care. Mershon-SMF ¶ 49. The record contains no medical opinion identifying Mershon's treatment decisions on October 28 as inconsistent with the applicable standard of care. Mershon-SMF ¶ 48.

## Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden in establishing that no material facts are in genuine dispute. *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 160 (1970). Any doubt as to the existence of a genuine issue is resolved against the moving party. *Id*.[4]

## Analysis

Upon screening, Lisle was permitted to proceed in this case on Eighth Amendment deliberate indifference claims and state-law medical negligence claims regarding the denied use of a wheelchair on October 28 against the Officer Defendants and Mershon. Dkts. 12, 56.

### A. Eighth Amendment Deliberate Indifference Claims

The Eight Amendment protects prisoners from officials' deliberate indifference to their serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prevail on a claim that her medical care violated the Eighth Amendment, Lisle must establish that: (1) she suffered from an objectively serious medical condition; and (2) the Defendants were deliberately indifferent to that

[4] The above recitation of facts shows that this is a case with several factual disputes. But the Court may grant summary judgment if facts are in dispute, so long as those facts are not outcome determinative. *Matter of Wildman,* 859 F.2d 553, 556 (7th Cir.1988). As demonstrated in the below Analysis, the Court has resolved those disputes in favor of Lisle, the non-movant, and concluded that they are not material and that Defendants are nonetheless entitled to judgment as a matter of law. Specifically, and as more fully explained below, the Court: (1) accepts that Lisle's medical records do reflect that she complained of leg pain and mobility issues from October 20 -28, but finds that whether those subjective complaints rose to an "objectively serious medical condition" is not dispositive because no Defendant was ultimately deliberately indifferent to her complaints and condition; (2) credits Lisle's testimony that she remained in possession of the wheelchair from October 20 through the morning of October 28, but finds that this is immaterial because it is undisputed that she never had a permit to possess it; (3) credits Lisle's testimony that Officer Fiorini told her that Mershon directed him to deny Lisle the use of the unauthorized wheelchair during transport to the October 28 appointment, but concludes that this testimony tends to negate Fiorini's liability because it demonstrates that Fiorini, a layperson security officer, properly deferred to medical personnel on matters of medical treatment, *see Burks v. Raemisch,* 555 F.3d 592, 596 (7th Cir. 2009) ("A layperson's failure to tell the medical staff how to do its job cannot be called deliberate indifference"); and (4) credits Lisle's testimony that an unidentified Dixon doctor told her verbally on October 21 or 22 that she could use the wheelchair, but finds that this is immaterial because Mershon's disagreement, based on exercise of her own medical judgment, with that physician does not establish an Eighth Amendment violation, *see Riley v. Waterman*, 126 F.4th 1287, 1296 (7th Cir. 2025) ("[d]isagreement ... between two medical professionals[ ] about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation") (citation and quotation omitted). Finally, Lisle's testimony that Mershon did not examine her after she fell on October 28 does not create a genuine dispute because her testimony is wholly contradicted by the contemporaneous medical records (and affidavit), which documented that Lisle was examined and medically cleared to ambulate back into her cell. *See e.g., Myers v. McAuley*, 2003 WL 22232830 (N.D. Ill. Sept. 11, 2003); *Walker v. Peters*, 863 F. Supp. 671, 672–73 (N.D. Ill. 1994).

condition. *See Lockett v. Bonson*, 937 F.3d 1016, 1022 (7th Cir. 2019) (citing *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011)).

### *1. Objectively Serious Medical Condition*

Both Mershon and the Officer Defendants argue that Lisle's complaints of leg pain and/or complaints of an inability to walk following the October 20 fall did not rise to the level of a serious medical condition. Mershon-MEM, pg. 7-8; Officers-MEM, pg. 5-7. A medical condition is objectively serious if it "has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotation marks and citation omitted). Defendants argue that because Lisle was examined repeatedly by physicians, both internally at Dixon and also at two outside hospitals, who all found no impaired mobility and no lower-extremity injury, her subjective complaints of pain do not meet the above standard. The Defendants' characterization of the medical records is accurate – and undisputed. But Lisle's subjective complaints of leg pain did persist and were examined. The Court concludes that in light thereof, whether Lisle suffered from a serious medical condition with respect to the condition of her legs post-fall is a question for a jury (were this case going forward). As the Seventh Circuit has observed, "[p]ain is a uniquely subjective experience, and it is not appropriate to conclude at summary judgment that nontrivial pain alleged by an inmate is not deserving of treatment." *Diaz v. Godinez*, 693 F. App'x 440, 443-44 (7th Cir. 2017) (finding chronic back pain treatable with over-the-counter pain relievers serious enough to support an Eighth Amendment deliberate indifference claim); *see Holmes v. Lochard*, No. 17 C 1160, 2018 WL 5815518, at *4 (C.D. Ill. Nov. 6, 2018) ("Plaintiff's self-described [shoulder] pain and limited range of motion allow an inference that he [had an objectively serious medical need]").

The Court therefore considers, for present purposes, that Lisle might be able to establish that her medical condition was sufficiently serious to satisfy the first prong of the analysis. Ultimately, though, even assuming that Lisle's leg pain crossed the Eighth Amendment threshold, she has not brought forth evidence that any Defendant was deliberately indifferent to her incumbent needs for the reasons discussed below.

### *2. Subjective Deliberate Indifference*

To show deliberate indifference, "a plaintiff must establish that [the] official knows of and disregards an excessive risk to inmate health or safety or that the official is both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he draws the inference." *Johnson v. Dominguez*, 5 F.4th 818, 825 (7th Cir. 2021). "Deliberate indifference occupies a space slightly below intent and poses a 'high hurdle and an exacting standard'". *Stockton v. Milwaukee County*, 44 F.4th 605, 615 (7th Cir. 2022) (quoting *Donald*, 982 F.3d at 458). Establishing deliberate indifference "requires a showing of something approaching a total unconcern for the plaintiff's welfare in the face of serious risks." *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022).

**a. Officer Defendants**

The Officer Defendants argue that they cannot be found deliberately indifferent here where none of Lisle's medical providers issued her a wheelchair permit, and the Officers – in their roles as security officers – deferred to the medical judgment of her providers in thereby terminating her unauthorized use of the wheelchair. Officers-MEM, pg. 8-9.

The Court agrees. The Seventh Circuit has recognized repeatedly that when prisoners are under the care of medical professionals, administrative prison staff may generally trust the professionals to provide appropriate medical attention. In fact, "[t]he law encourages non-medical security and administrative personnel at jails and prisons to defer to the professional medical judgments of the physicians and nurses treating the prisoners in their care without fear of liability for doing so." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010). Thus, courts typically do not hold security or other administrative staff liable for deliberate indifference in a case where a prisoner is under medical providers' care. *See Burks v. Raemisch,* 555 F.3d 592, 596 (7th Cir. 2009) ("A layperson's failure to tell the medical staff how to do its job cannot be called deliberate indifference"); *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005) (when inmate is under the care of doctors, "a non-medical prison official will generally be justified in believing that the prisoner is in capable hands.") (cleaned up); s*ee also Johnson v. Snyder*, 444 F.3d 579, 586 (7th Cir. 2006) (fact that medical staff was addressing prisoner's medical needs insulated the warden from liability). In a rare case, if a non-medical defendant has reason to believe a prisoner may not be receiving constitutionally adequate medical care, he or she may have an obligation to at least investigate the complaint. *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008).

Lisle had been receiving medical care for her post-fall injuries in the week leading up to October 28. Despite that diagnostic testing had been conducted and three sets of treaters (at KSB, Dixon, and CGH) had evaluated her complaints of leg pain and immobility throughout that preceding week, no medical record contains any diagnosis of a lower extremity injury, any indication that Lisle required a medical assistive device, any indication that a wheelchair was medically necessary, or any indications that a wheelchair permit was going to be, or had been, entered. Lisle also concedes that no medical provider in fact ever issued her a wheelchair permit. She also introduced no evidence disputing Ditzler's testimony that he was instructed to remove the wheelchair by other staff *because Lisle lacked a medical permit for it*.[5] Mershon denies discussing the wheelchair with Fiorini, but at summary judgment, the Court will credit Lisle's testimony that Fiorini told her that Mershon directed him to deny Lisle the use of the unauthorized

[5] Lisle asserts that the October 28 Daily Shift Roster was "altered" to make it appear that Ditzler was assigned as an Escort Officer, when in fact he was assigned to the Visiting Room. PMEM, pg. 92-93. Lisle also focuses on the fact that the Officer Defendants never identified the official that directed Ditzler to remove the wheelchair. PMEM, pg. 92-93. Lisle insists that she had thus demonstrated disputes of fact that Ditzler was apparently not authorized to remove the wheelchair, precluding summary judgment. PMEM, pg. 92-93. These arguments are not well-taken. First, although the Shift Roster does reflect that Ditzler was reassigned via a handwritten change, the roster is *replete* with countless such handwritten re-assignments and changes in staffing, just like the one applicable to Ditzler. PEXS, pg. 146, 163-164. This negates any inference that the document was nefariously "altered" for this case. And Lisle has not produced any evidence whatsoever that Ditzler was "unauthorized" to remove the wheelchair or did so for undisclosed reasons other than those he testified to. Lisle "must present more than mere speculation or conjecture". . . to dispute Ditsler's testimony and . . . "defeat a summary judgment motion." *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021); *see also Siegel v. Shell Oil Co*., 612 F.3d 932, 937 (7th Cir. 2010) ("summary judgment is the 'put up or shut up' moment in a lawsuit").

wheelchair during transport to the appointment; in other words, the Court will accept Lisle's version of events that Fiorini was *acting at the direction of medical personnel.*

On this record there is no evidence that the Officer Defendants were deliberately indifferent to the condition of Lisle's legs on October 28. It is undisputed that none of Lisle's treating physicians issued her a wheelchair permit. It is undisputed that the Officer Defendants removed and then declined to return the wheelchair because medical personnel had not issued a permit for its use, as dictated by prison policy. The Court recognizes that Lisle testified that she informed both Officers on October 28 that an unidentified Dixon doctor had told her verbally that she could use the wheelchair because she felt her legs were not yet mobile. But these sparse, vague communications and her fleeting interactions with the Officer Defendants about her purported undocumented, verbal conversation a week earlier with an unidentified doctor do not suffice to suggest that this a "rare" case where a layperson in the Officer Defendants' positions should have foregone deference to the medical staff (which had not issued a permit) and would have known that Lisle was nonetheless at a substantial risk of harm without a wheelchair. *See Hayes*, 546 F.3d at 527; *Kourani v. Sproul*, No. 25-1821, 2026 WL 2445436, *2 (7th Cir. Aug. 20, 2026) ("complaints that convey only a generalized or vague concern about one's condition will not support an inference that a prison official had actual knowledge that a prisoner faced a serious medical risk"). Therefore, the Officer Defendants reasonably relied on the fact that no medical provider had issued a permit for the wheelchair and concluded that Lisle could not continue to possess it unauthorized, contrary to prison policy. *See, e.g., McGuire v. Weldon,* No. 3:23-cv-446, 2024 WL 4987241 (N.D. Ind. Dec. 4, 2024) (granting summary judgment for prison officials, holding that officials reasonably relied on medical staff's determination that inmate on crutches could ambulate to dining hall). The Court finds that no reasonable jury could find that the Officer Defendants acted with a near "total unconcern" for Lisle's welfare by declining to allow her to keep the contraband wheelchair at her behest. *See Stockton*, 44 F.4th at 615; *Greeno*, 414 F.3d at 656; *Burks,* 555 F.3d at 596.

For these reasons, the Officer Defendants are entitled to summary judgment.

**b. Defendant Mershon**

"To survive summary judgment" against a treating medical professional like Mershon, Lisle "need[s] to present evidence sufficient to show that [a medical professional's] decision was 'so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" *Whiting v. Wexford Health Sources, Inc*., 839 F.3d 658, 664 (7th Cir. 2016) (citation omitted); *see also White v. Woods*, 48 F.4th 853, 862 (7th Cir. 2022) (treatment must be "so inadequate that it demonstrated an absence of professional judgment"); *Johnson v. Rimmer*, 936 F.3d 695, 707 (7th Cir. 2019) (same).

Where evidence shows that a medical provider's "decision was based on medical judgment, a jury may not find deliberate indifference" absent evidence "that the defendant[] knew better than to make the medical decisions that they did[.]" *Clemons v. Wexford Health Sources, Inc.*, 106 F.4th 628, 635 (7th Cir. 2024) (citation and quotation marks omitted). A prisoner's mere disagreement with a medical professional's treatment decision is not enough to establish deliberate indifference. *Boykins v. Wilson*, No. 23-3027, 2025 WL 48413, at *3 (7th Cir. Jan. 8, 2025) (citing *Thomas v.*

*Martija*, 991 F.3d 763, 772 (7th Cir. 2021)). "A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under [the] circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (citation and quotation marks omitted).

Mershon argues that she is entitled to summary judgment because she exercised medical judgment in deciding how to treat Lisle's complaints of leg pain and requests for a wheelchair on October 28. Mershon-MEM, pg. 8-12. Mershon testified – and her contemporaneous medical record echoes – that at the initial appointment (prior to the fall) Mershon attempted to discuss the risks and benefits of wheelchair use in conjunction with a soft-tissue injury with Lisle, but she would not engage in a discussion of that nature. Mershon further testified, consistent with her medical record, that she determined that a wheelchair was not required for Lisle based on: (1) Lisle's clinical presentation, specifically that Mershon observed her ambulating without aid, and (2) review of the CGH medical records, which showed no significant abnormalities in Lisle's CT scans, conducted five days prior. Lisle specifically does not dispute either. PRESP, pg. 7 at ¶ 8(j). Lisle also specifically does not dispute that Nurse Engel witnessed Lisle independently ambulating when she presented to Mershon. PRESP, pg. 9 at ¶ 8(r). Then, following Lisle's fall, Mershon examined Lisle and documented some tenderness "upon palpitation", but no bruising, swelling, or deformity. Mershon therefore determined that Lisle had not sustained any serious or additional injuries, that she was able to ambulate into her cell under her own power, and that she required no emergent medical attention. Mershon further prescribed Lisle a narcotic pain-killer, and she received a 7-day course starting the following day. This record amply supports a conclusion that Mershon exercised her medical judgment in her response to Lisle's complaints of leg pain and immobility, including by declining to permit Lisle the use of a wheelchair.

It is abundantly clear that Lisle wanted nothing less than a wheelchair to address her complaints of leg pain. But the fact that Mershon did not permit the use of a wheelchair is not evidence of deliberate indifference. A prisoner's own "mere disagreement with the course of treatment is not evidence of deliberate indifference." *Lewis v. Sood*, 126 F.4th 525, 531–32 (7th Cir. 2025). The Eighth Amendment does not entitle prisoners to their preferred treatment. *See Arce v. Wexford Health Sources, Inc.*, 75 F.4th 673, 681 (7th Cir. 2023). A prisoner "is not entitled to demand specific care"; he is entitled only to "reasonable measures to meet a substantial risk of serious harm". *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). To defeat summary judgment, Lisle was required to identify evidence that Mershon "knew better than to make the medical decisions that [she] did", *Clemons*, 106 F.4th at 635, or that "no minimally competent professional would have so responded under [the] circumstances." *Pyles*, 771 F.3d at 409.

Lisle made no such showing. To the contrary, three other sets of treaters (at KSB, Dixon, and CGH) had evaluated Lisle's complaints of leg pain and immobility throughout the week since Lisle fell and reached similar conclusions to Mershon. Lisle does not dispute that none of their medical record from October 20-27 contains any diagnosis of a lower extremity injury, any indication that Lisle required a medical assistive device, any indication that a wheelchair was medically necessary, or any indications that a wheelchair permit was going to be, or had been, entered. The treater at KSB also explicitly found that Lisle was malingering. What Lisle does point to is her testimony that she told Mershon that an unidentified Dixon doctor had verbally authorized her to use a wheelchair. PMEM, pg. 106-107. Even if the Court credits Lisle's

testimony and accepts that this verbal conversation with the Dixon doctor occurred, as the Court must at summary judgment (despite that her testimony is not reflected in the doctor's medical records), mere "[d]isagreement ... between two medical professionals[ ] about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Riley v. Waterman*, 126 F.4th 1287, 1296 (7th Cir. 2025) (citation and quotation omitted); *see Cooper v. Dombeck*, No. 25-1686, 2026 WL 1412593, at *3 (7th Cir. May 20, 2026) ("prison medical staff are not required to follow the recommendation of specialists if they are aware of the recommendations and choose a different course of action based on their own medical judgments") (citing *Wilson v. Adams*, 901 F.3d 816, 822 (7th Cir. 2018)); *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) ("There is not one 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field."). On this record as a whole, the fact that one Dixon doctor purportedly verbally authorized use of a wheelchair does not tend to demonstrate that Mershon's medical judgment to the contrary was incompetent.

For all these reasons, Defendant Mershon is entitled to summary judgment.

## B. State Law Claims

With summary judgment granted on each of Lisle's federal claims, the Court has discretion whether to exercise supplemental jurisdiction over her state-law medical malpractice against Mershon and state-law negligence claim against the Officer Defendants. 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim...if...the district court has dismissed all claims over which it has original jurisdiction ...."); *see also Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise supplemental jurisdiction after dismissing every claim over which it had original jurisdiction is entirely discretionary."). "Indeed, when the federal claims are dismissed before trial, *there is a presumption* that the court will relinquish jurisdiction over any remaining state law claims." *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 631 (7th Cir. 2016) (emphasis added).

In the Seventh Circuit, "the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly*, 193 F.3d 496, 501 (7th Cir. 1999); *see also Sharp Elecs. v. Metro. Life Ins.*, 578 F.3d 505, 514 (7th Cir. 2009) ("Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits.") (internal quotation marks and quoted authority omitted). Exceptions to the general rule exist: "(1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided." *Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008) (internal quotation and citation omitted).

No circumstances in this case overcome the presumption that the Court should relinquish jurisdiction over Lisle's state-law claims. First, the statute of limitations is not a factor. Under the applicable Illinois law, when a federal court dismisses a state-law claim for "lack of jurisdiction … the plaintiff … may commence a new action within one year or within the remaining period of

limitation, whichever is greater." 735 ILCS 5/13-217; *see also Granger v. Rauch*, 388 Fed. Appx. 537, 542 (7th Cir. 2010). Second, the Court has not expended significant resources on the pending state-law claims. Lisle never filed a physician's statement attesting that her medical negligence claim has merit, which is required by Illinois' Healing Art Malpractice Act, 735 ILCS § 5/2-622(a), when bringing a medical negligence claim. There has thus been little discovery, above and beyond that pertaining to the federal claims, nor in-depth briefing of the state-law claims. Third, it is not "absolutely clear" how the state-law claims, based on application of Illinois medical malpractice law, should be resolved. Finally, comity favors allowing an Illinois court to decide issues of state law. *See City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (when deciding whether to exercise supplemental jurisdiction, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity") (internal quotation marks and citation omitted).

Accordingly, the Court exercises its discretion and relinquishes supplemental jurisdiction over Lisle's state law claims.

## **Conclusion**

The Court grants Defendants' motions for summary judgment [147] [152]. Final judgment will be entered in favor of Defendants Ditzler, Fiorini, and Mershon, and against Plaintiff Lisle. This case is closed.

Date: September 30, 2026 By: ______________________________

Iain D. Johnston
United States District Judge